Argued and submitted June 8, the decision of the Court of Appeals and judgment of the trial court affirmed August 2, reconsideration denied September 20, 1988

STATE OF OREGON,
*Respondent on Review,*

*v.*

THOMAS HENRY PIDCOCK,
*Petitioner on Review.*

(CC 10-85-09438; CA A40456; SC S34991)

759 P2d 1092

Larry R. Roloff, Eugene, argued the cause and filed the petition for petitioner on review.

Rives Kistler, Assistant Attorney General, Salem, argued the cause for respondent on review.

JONES, J.

**JONES, J.**

Defendant appealed his convictions on two counts of unlawful possession of a controlled substance, ORS 475.992(4)(b), contending that the trial court erred in denying his motion to suppress evidence. The Court of Appeals affirmed. *State v. Pidcock,* 89 Or App 443, 749 P2d 597 (1988). We affirm the decision of the Court of Appeals.

## FACTS

The Court of Appeals recited the stipulated facts of the parties as follows:

"On February 14, 1985, a Mrs. Joll and her daughter Mary were driving toward their residence, just off Crow Road, in Lane County. As they approached the mailbox adjacent to their driveway, they observed what appeared to be a pillow or pillowcase lying near the mailbox. They stopped, and Mary examined the pillowcase and found a black leather briefcase. They took the briefcase to their house and spent several minutes trying to get it open. There was no identification on the exterior. They then called the sheriff and reported finding the briefcase. They were told that ordinarily the sheriff would not respond to someone's finding lost property. Joll indicated that this particular briefcase appeared to be somewhat unusual and that it was quite nice and new leather, with combination tumbler locks. It was locked at the time, and there was something heavy inside that was sliding around.

"On February 15, 1985, at about 8:30 a.m., Deputy Larson went to the Joll residence and examined the briefcase briefly. He turned the tumblers to zero, which opened the case. Not knowing what was in it, and because there was some type of heavy object sliding around in it, he cracked it open an inch or two so that he could peer inside without fully opening the lid. He observed a large stack of money with a $100 bill on top. He also observed what appeared to be an automatic or semi-automatic handgun, a baggie that appeared to contain marijuana, manila envelopes and some other small items which he could not identify. There appeared to be a wire extending from inside the briefcase to its top.

"Because of the wire, Larson called the Eugene Police Department bomb squad to have it examine the briefcase. He thought that it might be booby-trapped. The bomb squad took the briefcase outside the Joll residence and x-rayed it. Readily apparent were a handgun, what appeared to be an extra automatic clip with ammunition, eyeglasses and other indistinct

items. They were not able to determine from the x-rays whether there was an explosive device inside. The briefcase was then opened on one side, and its contents were carefully removed. There were two manila envelopes, one sealed. The glasses were wire-rimmed with a fairly thin black plastic coated substance on the wire, which was the wire Larson had observed. The briefcase was not booby-trapped.

"Late that morning, the briefcase and its contents were taken to the sheriff's office. The manila envelopes were opened and examined. No identification of the owner was found. State Crime Lab technician Bekkedahl tested the substances found in the envelopes and determined that they were cocaine and methamphetamine.

"After the property was returned to the sheriff's office from the crime lab, the money was determined to be about $9,000. Defendant's fingerprints were found on the envelopes. The weapon was a .45-caliber automatic, fully loaded, which appeared to be in working order.

"The sheriff was concerned about the welfare of citizens in the area where the briefcase was found, fearing that someone who had lost it might harass or threaten residents to get it back. Because of that concern, in mid-afternoon of February 15, the news media were invited to come to the sheriff's office for a press conference. On the morning of that day, a telephone call had come to the *Eugene Register-Guard* from a person requesting that a classified ad be placed concerning a briefcase lost in the Crow Road area. That afternoon, a second phone call was received from an adult female who indicated that she wanted the classified ad withdrawn. She asked that the bill be sent to 'Tom Pidcock' and she gave defendant's address and phone number.

"* * * [B]etween 6 and 6:30 p.m. on St. Valentine's Day, people had been observed in the Crow Road area driving a vehicle slowly up and down the road apparently looking for something. The vehicle was registered to defendant.

"After being advised of the 'finders-keepers law,' ORS 98.005 *et seq,* Joll placed an advertisement in the *Register-Guard* advertising the finding of the briefcase and how it could be obtained. She specifically rented a separate post office box for the sole purpose of responses to her advertisement. Other than junk mail, she received no responses. The *Register-Guard* published news stories at least twice between February 16 and February 20 about the briefcase." 89 Or App at 445-47.

The record establishes that defendant never claimed the brief-case, apparently fearing apprehension.

## MOTION TO SUPPRESS

The sheriff did not obtain a warrant for the search of the briefcase or its contents. Defendant moved to suppress the briefcase and its contents, relying on Article I, section 9, of the Oregon Constitution and the federal Fourth Amendment. Defendant argues: (1) The police had no authority to open and search the briefcase; (2) the police had no probable cause to believe that the briefcase contained contraband; and (3) once the police opened the briefcase, they needed a warrant to open and search the manila envelopes. The Court of Appeals rejected these arguments and held that when defendant made no effort to claim or recover the briefcase after he learned the briefcase and contents were in police custody, that defendant "abandoned" the property in a constitutional sense. The Court of Appeals stated: "One who acts to abandon property cannot claim a constitutional violation, even if the act was done to avoid police action." 89 Or App at 448.

■■ We disagree with the Court of Appeals' analysis, although we affirm the result. Defendant did not "abandon" the briefcase until after the deputies had opened the briefcase and opened the envelopes and tested their contents without a warrant. When the deputies opened the briefcase and tested the contents, defendant was still actively attempting to recover that property. Defendant nevertheless loses the motion to suppress, because the deputies were not searching the briefcase or contents for contraband related to any criminal activity. Rather, when the police opened the briefcase and the envelopes, they were simply trying to identify the owner.

■■ Finders of lost property have a statutory duty to attempt to return the property to its owner. When the finder of the property turned it over to law enforcement officers, on the finder's own initiative, the deputies were placed in the position of the finder. ORS 98.005 provides:

"(1) If any person finds money or goods valued at $25 or more, and if the owner of the money or goods is unknown, such person, within 10 days after the date of the finding, shall give notice of the finding in writing to the county clerk of the county in which the money or goods was found. Within 20 days after the date of the finding, the finder of the money or

goods shall cause to be published in a newspaper of general circulation in the county a notice of the finding once each week for four consecutive weeks. Each such notice shall state the general description of the money or goods found, the name and address of the finder and final date before which such goods may be claimed.

"(2)   If no person appears and establishes ownership of the money or goods prior to the expiration of six months after the date of the notice to the county clerk under subsection (1) of this section, the finder shall be the owner of the money or goods."

The statutes concerning lost or misplaced property, taken together, place a burden on the finder of lost property to discover the owner of the property. ORS 98.005 gives the finder a claim to the property if the owner is unknown. If the owner is known, ORS 98.005 does not apply.

■     Under the facts as determined by the trial court, the sheriff's deputies were simply assisting the finder of the property to ascertain the identity of the owner or to determine if the owner of the briefcase was indeed unknown, as described in ORS 98.005. In doing so, an officer may open the briefcase in an attempt to identify the owner, just as the statute would make it reasonable and proper for the citizen to have done the same act.

The trial court accepted the prosecutor's statement of facts, which included the following:

"The property was taken to the Lane County Sheriff's office sometime late in the morning. The items were * * * taken, I should say not all of the items, but the Manila envelopes were examined to determine whether there was any identification of any kind within the Manila envelopes.

"There had been no identification of items that could identify an owner for this item in the briefcase.

"There are a number of pockets and places in the briefcase where that kind of material might be found. Those were examined, there was none.

"There was a number of other items, which I have not mentioned, in the briefcase, none of which were items of identification sort of material."

Apparently after the deputies opened the manila envelopes, seeking identification, they found plastic baggies

containing white and brownish granular material. The deputies could see, without conducting any search, that these baggies contained substances which they knew from experience probably contained cocaine and methamphetamine. The crime laboratory found that one of the plastic baggies contained cocaine and the other baggie contained methamphetamine.

Defense counsel stipulated to the statement of evidence by the prosecutor, but did comment as follows:

"There was one statement that [the prosecutor] made, which I would just — I want to clarify. It is a small point, but it is the only one out of everything he said I would even take issue with. And that is, that he did make a statement that the further investigation of the contents were for purposes of determining identification.

"I might differ with him, as a point of argument, as to what they were really doing in connection with the further search into these closed envelopes.

"And so, I might take exception to his statement as to what the police officer's intentions were, but not with the fact that, of course, they did thoroughly examine everything that was in the briefcase, apparently."

The trial court resolved this factual dispute by stating:

"[T]here was a reasonable basis for inquiry by the party that found it, and secondly by the officers that assisted the party that found it to do two things.

"One, would be the question of whose is it, question of identification. And the second issue would be perhaps a question of — was it dangerous? * * *"

The court then concluded:

"My view is this: Number one, there was a reasonable — that the action to open the briefcase was reasonable under the circumstances. That no one was aware whose privacy was involved. * * *

"* * * * *

"It will be the ruling that the motion will be denied. * * *"

From the above, it is apparent that the trial court found that the sheriff's deputies had opened the briefcase, first to discover identification and, second, to find out whether

it contained a bomb. Once the deputies had opened the brief-case, the manila envelopes were readily visible. Nothing about the manila envelopes announced their contents. The trial court found that the deputies opened the envelopes in a further attempt to identify the owner of the property. That was reasonable. It was done in pursuit of a statutory, non-prosecutorial objective, not law enforcement. *Compare State v. Bridewell,* 306 Or 231, 759 P2d 1054 (1988). The evidence that the deputies found and used to prosecute defendant was not sought in the course of this civil function. *Cf. Nelson v. Lane County,* 304 Or 97, 743 P2d 692 (1987), where the actions were not a part of the police's civil functions. Once the deputies opened the manila envelopes for that legitimate purpose, the contents of the plastic baggies "announce[d] their contents," *see State v. Owens,* 302 Or 196, 206, 729 P2d 524 (1986), and no search warrant was necessary for the deputies to deliver the baggies to the crime laboratory for testing. Obviously, the deputies had probable cause to obtain a warrant to open the manila envelopes once they found the weapon, the marijuana and the $9,000. Had the deputies opened the manila envelopes in search of contraband, they would have violated defendant's state and probably federal constitutional rights. However, the trial court found that the deputies were seeking identification and not contraband. That finding is supported by the evidence and is binding upon us. *Ball v. Gladden,* 250 Or 485, 443 P2d 621 (1968). As such, the opening of the manila envelopes by the sheriff's department was permissible and the trial court properly denied the motion to suppress.

The decision of the Court of Appeals and the judgment of the trial court are affirmed.